**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Great American Duck Races Incorporated,<br><br>Plaintiff,<br><br>v.<br><br>Kangaroo Manufacturing Incorporated, et al.,<br><br>Defendants. | No. CV-17-00212-PHX-ROS<br><br>**ORDER** |

As established at trial, ducks in nature are often yellow and usually have wings, bills, and tails. But "[d]ucks do not naturally wear sunglasses in the wild." (Doc. 177 at 27). Both parties decided to try to improve on nature by manufacturing pool floats in the shape of ducks wearing sunglasses. Plaintiff Great American Duck Races Inc. ("GAME") owns copyrights and trademarks covering its depiction of a duck wearing sunglasses and GAME believes the pool float manufactured by Defendant Kangaroo Manufacturing Inc. ("Kangaroo") infringed those copyrights and trademarks. GAME also believes Kangaroo engaged in unfair competition. Based on the evidence presented at the trial, all of GAME's claims do not succeed.

**BACKGROUND**

Many of the relevant facts were undisputed at trial but to the extent there were factual disagreements, the following represent the Court's factual findings. In 1988, Eric Schechter started GAME. At the time, GAME was focused on conducting fundraising activities. The fundraising concept was for individuals to "adopt" a small toy duck and

then all the ducks would "race" on a waterway, such as the Salt River Canal or in New York Harbor. (Doc. 176 at 36). The person who had adopted the duck that finished first would win "a new car [or] prizes," which had been donated. The sponsoring organization would then retain all the "adoption" fees. (Doc. 176 at 35). Hoping to prevent knockoffs, Schechter realized he needed to "brand" or make GAME's races "unique." "[O]ne of the ways to do that was the duck itself." (Doc. 176 at 33). Thus, Schechter and a few other individuals designed a unique plastic duck to use in the fundraising activities. (Doc. 176 at 27, 30).

Schechter and his collaborators designed a small duck from "scratch." (Doc. 176 at 33). GAME's original duck was similar to the familiar Rubber Duckie of Sesame Street fame with one crucial alteration: sunglasses. As explained by Schechter, the sunglasses served no functional purpose. (Doc. 176 at 34). Rather, the sunglasses were merely to differentiate GAME's duck from other similar ducks already available in the market.

GAME experienced great success in its fundraising business. In 2001, a major retailer approached GAME and asked "to take the duck and make it into some pool products." (Doc. 176 at 38). That inquiry resulted in GAME producing a few products, such as a "pool-dispensing chlorinator" with the distinctive GAME duck on the top. (Doc. 176 at 40). In 2012 or 2013, other retailers asked GAME to make a large inflatable in the shape of GAME's duck. (Doc. 176 at 61). In 2015, GAME produced what it calls the "Giant Inflatable Derby Duck." That product was offered for sale in 2016 and it became an immediate hit. (Doc. 176 at 66, 77-78).

The Giant Inflatable Derby Duck ("Derby Duck"), when inflated, measures 81 inches long, 76 inches wide, and 44 inches tall.[1] The Derby Duck is yellow and has a red bill, which is open. The top of the Derby Duck's head has a small crest. The Derby Duck is wearing black sunglasses that are also inflatable, giving them a striking three-dimensional appearance. The Derby Duck has inflatable wings and an inflatable tail.[2] The

---

[1] GAME made a smaller version of the duck as well but the parties have focused on the larger version.
[2] There appear to be two slightly different versions of GAME's duck. One version has inflatable feet. (Doc. 1-1 at 17). A second version, and the version presented at trial, does

- 2 -

Derby Duck is a "flatbed float" which means there is a flat surface where individuals can sit or lie down without touching the water. (Doc. 176 at 110).

The Derby Duck is sold in a rectangular box. On the front of that box is a picture of the Derby Duck in a swimming pool, with three people sitting on it and one standing next to it. The name "Giant Inflatable Derby Duck" is written across the top of the front in blue letters on a white background. The bottom of the box's front has white writing on a blue background. The other sides of the box also have blue backgrounds with white writing. The back of the box is mostly white with blue writing. The back also has a different picture, depicting a woman lying on the Derby Duck.

GAME has sold tens of thousands of its Derby Duck through numerous retailers. The Derby Duck has appeared in the press and in viral videos. When purchasing the Derby Duck, consumers encounter either the product box or two-dimensional pictures. Consumers usually do not see the Derby Duck inflated prior to purchasing.

GAME owns various copyrights and trademarks involving a duck wearing sunglasses. GAME uses its trademarks in selling "a wide variety of products and services" including the Derby Duck as well as "pool lights, chlorinators, and thermometers." (Doc. 183 at 3). One of GAME's trademarks is:



(Doc. 1-1 at 12). GAME has devoted considerable resources in promoting, advertising, and marketing its products and services using its trademarks.

The parties have stipulated the Derby Duck "is an original work of authorship

---

not have inflatable feet.

protected under the Copyright Act." (Doc. 183 at 3). GAME registered the Derby Duck with the United States Copyright Office and it is protected under Copyright Reg. No. VA0002004191. That Copyright is titled "Giant Inflatable Derby Duck." A few years after the Derby Duck was first sold, competitors began to emerge.

Defendant Justin Ligeri was responsible for production of one of the Derby Duck's competitors. Ligeri is the owner of Defendants Kangaroo and Yagoozon, Inc. (Doc. 176 at 124). Kangaroo was incorporated in 2014 and has offices in Tempe, Arizona. (Doc. 176 at 124). It purportedly is in the business of manufacturing "toys [and] novelties for mass consumption." (Doc. 176 at 124). It is unclear when Yagoozon was established but it was not a manufacturer. Instead, Yagoozon was in the business of "selling products at retail that it bought from other manufacturers." (Doc. 176 at 125). Yagoozon sold products exclusively on Amazon.com.[3] (Doc. 176 at 124). Neither Kangaroo nor Yagoozon engaged in normal corporate formalities, such as regular board meetings. (Doc. 176 at 127). For present purposes, the Court will usually refer simply to Kangaroo when discussing the activities of Kangaroo and Yagoozon.

Ligeri and Kangaroo experienced substantial success selling products on Amazon. (Doc. 176 at 130). At one point, Ligeri offered live seminars to teach other individuals how to successfully sell products on Amazon. In advertising those seminars, Ligeri very confidently appeared in a video where he presented his business model. What he would enlighten others to do was to "create a product for Amazon that people are looking for already." (Doc. 176 at 137). At trial, Ligeri explained that statement meant he instructed people to "to look for what people are searching for . . . and then improve upon what the marketplace is offering." (Doc. 176 at 139-40). In practice, it was clear that Ligeri and his companies would identify successful products on Amazon and then make slightly different versions of those products without apparent concern about possible intellectual property violations. That design process was described in detail at trial.

According to Bernard Oliver, Kangaroo's product designer, he received design

---

[3] In 2018, Yagoozon filed for Chapter 7 bankruptcy. (Doc. 120). The Bankruptcy Court lifted the automatic stay to allow this case to proceed. (Doc. 144).

- 4 -

instructions from David Follett, Kangaroo's Executive Director. (Doc. 177 at 125). Follett would "come in with a product that was already in the field, and he would say: This is a product we are going to produce under Kangaroo." (Oliver Deposition at 28). Follett did not instruct Oliver to copy the product in its entirety. Instead, Follett would hand Oliver the "product and say: We want to make something like this, bigger, brighter. It has got to be better, but basically, this is the product we are making." (*Id.* at 37). In other words, the Kangaroo product was meant to be "bigger and better" but it was meant to "look in [the same] realm" as the existing products. (*Id.* at 74). When asked whether Kangaroo investigated intellectual property rights before producing its products, Oliver stated he was "not really part of . . . those types of discussions." In addition, Oliver did not have time to investigate intellectual property rights because Kangaroo was operated "like a sweatshop" where he "worked all day" and only left when he was "exhausted." (*Id.* at 39).

In late 2015 or early 2016, Follett decided Kangaroo should manufacture "novelty pool floats." (Doc. 176 at 147). Follett looked at the available pool floats and discovered four duck pool floats sold by four different companies. (Doc. 176 at 148). Follett provided the other companies' products to Oliver and instructed Oliver to "create the design of a pool float in the form of a yellow duck with sunglasses [but] make it different from the yellow duck pool floats" already on the market. (Doc. 176 at 148). Oliver designed the new pool float and Kangaroo manufactured its own duck-wearing-sunglasses pool float. In other words, Oliver had the Derby Duck when designing Kangaroo's duck and, to some extent, modeled Kangaroo's duck after the Derby Duck. Oliver did not, however, slavishly copy the Derby Duck. Thus, while there are some similarities, there are also significant differences.

Kangaroo's duck is about one-third the size of the Derby Duck. (Doc. 176 at 108). When inflated, Kangaroo's duck is 49 inches long, 45 inches wide, and 32 inches tall. That size means Kangaroo's duck can only accommodate one person. Kangaroo's duck is yellow with a closed orange bill. Unlike the Derby Duck, Kangaroo's duck is a ring instead of a flat surface. Also, Kangaroo's duck has wings and a tail that are drawn on instead of

being inflatable like the Derby Duck. Like the Derby Duck, however, Kangaroo's duck has a small crest on its head and is wearing sunglasses. But the sunglasses on Kangaroo's duck are not completely black and they are not inflatable. Instead, the sunglasses are drawn on and have partially grey lenses and partially grey temples.

Kangaroo sold its duck in a rectangular box. The cover of Kangaroo's box is dominated by a picture of a young woman sitting on the duck. The cover consists of a blue and white background, with bubbles in the blue portions to evoke water. In the upper left of the box is writing in mostly black lettering stating "'HUGE' 49" Yellow Duck Pool Float." The back of the box contains a picture of the duck. The sides of the box are also blue and white with a picture of Kangaroo's duck along with the same lettering stating "'HUGE' 49" Yellow Duck Pool Float."

When asked why Kangaroo decided to put sunglasses on its duck, Follett explained that "[s]unglasses are cool" and because "[p]eople wear sunglasses at the beach." (Doc. 177 at 131). Kangaroo manufactures other floats depicting animals wearing sunglasses, such as a flamingo. (Doc. 177 at 131). Kangaroo also manufactures a duck float that does not have sunglasses. (Doc. 177 at 132).

Sometime in 2016, Kangaroo and Yagoozon began selling their duck-wearing-sunglasses float on Amazon. However, GAME was not able to present evidence establishing how Kangaroo's duck was listed on Amazon because the information was destroyed or was otherwise unavailable. Thus, it is unknown whether Kangaroo's Amazon listing included a picture of the box or merely displayed pictures of the duck. It is also unknown how prominently Kangaroo identified itself in the listing. For example, the listing might have emphasized the source of the duck was Kangaroo or the listing might not have indicated a source. In short, the Court has no material and admissible evidence of how Kangaroo marketed its duck or how consumers encountered the Kangaroo duck.

Around January 2017, GAME saw Kangaroo's duck listed for sale on Amazon. GAME complained to Amazon and Amazon immediately removed the listing. GAME also wrote to Kangaroo and claimed Kangaroo had "been selling a strikingly similar, knock-off

version" of the Derby Duck. According to GAME, Kangaroo's duck had "virtually the same appearance as" the Derby Duck. GAME requested Kangaroo "immediately stop all sales and distribution" of its duck. It is unclear whether Kangaroo responded to that letter but GAME filed the present suit a few days later. There was no evidence at trial that Kangaroo continued to sell its duck.

**ANALYSIS**

Pursuant to the operative complaint, GAME believes Kangaroo's duck infringes its copyright for the Derby Duck. GAME also believes Kangaroo has committed trademark infringement as well as federal and common law unfair competition. Prior to trial, GAME dismissed its claims for monetary relief. (Doc. 151). Accordingly, the only remaining issues are Kangaroo's liability and, if liability exists, whether GAME is entitled to a permanent injunction forbidding Kangaroo from marketing and selling its duck.

**I.    Copyright Infringement**

To prevail on its copyright infringement action, GAME needed to prove two things: (1) that it owns a valid copyright in the Derby Duck and (2) Defendants copied protected elements of the Derby Duck. *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1116 (9th Cir. 2018). The parties stipulated that GAME owns a valid copyright, leaving only the second element at issue.

As recently explained by the Ninth Circuit, "the second element has two distinct components: 'copying' and 'unlawful appropriation.'" *Id.* at 1117. "Proof of copying by the defendant is necessary because independent creation is a complete defense to copyright infringement." *Id.* And "[p]roof of unlawful appropriation . . . is necessary because copyright law does not forbid all copying." *Id.* Among other limitations, copyright law does not prohibit the copying of "'ideas' or 'concepts' used in the plaintiff's work." *Id.* Rather, copyright law only prohibits copying "the plaintiff's expression of those ideas or concepts to render the two works 'substantially similar.'" *Id.*

**A. Copying**

The evidence at trial established Kangaroo "copied" the Derby Duck when

designing its own duck. A Kangaroo employee reviewed the Derby Duck and instructed another employee to make a different version for Kangaroo to manufacture. (Doc. 176 at 148). That evidence is sufficient to satisfy the "copying" requirement. Contrary to GAME's position at trial and during post-trial argument, the fact that Kangaroo copied the Derby Duck does not establish liability. Even once GAME established "copying," it still had to prove "unlawful appropriation."

### B. Unlawful Appropriation

"To prove unlawful appropriation . . . the similarities between the two works must be "'substantial' and they must involve protected elements of the plaintiff's work." *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018). This requires "a two-part analysis consisting of the 'extrinsic test' and the 'intrinsic test.'" *Id.* at 1118. To prevail, GAME had to "prove substantial similarity under both tests." *Id.*

"The extrinsic test assesses the objective similarities of the two works, focusing only on the protectable elements of the plaintiff's expression." *Id.* In conducting this test, the Court must "'filter out' the unprotectable elements of the plaintiff's work" and then compare the protectable elements in the plaintiff's work with the "corresponding elements of the defendant's work to assess similarities in the objective details of the works." *Id.* The unprotectable elements are "ideas and concepts, material in the public domain, and . . . stock or standard features that are commonly associated with the treatment of a given subject." *Id. See also Folkens v. Wyland Worldwide, LLC*, 882 F.3d 768, 774 (9th Cir. 2018) (noting "[b]ecause the requirement is one of substantial similarity to *protected* elements of the copyrighted work, it is essential to distinguish between the protected and unprotected material in a plaintiff's work"); *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 917 (9th Cir. 2010) ("The key question always is: Are the works substantially similar beyond the fact that they depict the same idea?"); *Benay v. Warner Bros. Entm't*, 607 F.3d 620, 624 (9th Cir. 2010) ("A court must take care to inquire only whether the protect[able] elements, standing alone, are substantially similar.").

The Ninth Circuit addressed this "filtering out" process in some detail in a case

involving glass-in-glass jellyfish sculptures. There, the Ninth Circuit held "no copyright protection may be afforded to the idea of producing a glass-in-glass jellyfish sculpture or to elements of expression that naturally follow from the idea of such a sculpture." *Satava v. Lowry*, 323 F.3d 805, 810 (9th Cir. 2003). That meant the copyright holder could not "prevent others from depicting jellyfish with tendril-like tentacles or rounded bells, because many jellyfish possess those body parts." *Id.* at 811. The copyright holder also could not "prevent others from depicting jellyfish in bright colors, because many jellyfish are brightly colored," and he could not "prevent others from depicting jellyfish swimming vertically, because jellyfish swim vertically in nature and often are depicted swimming vertically." *Id.* Having filtered out what was not protectable, the Ninth Circuit concluded the copyright holder could only prevent others from copying "the distinctive curls of particular tendrils; the arrangement of certain hues; [and] the unique shape of jellyfishes' bells" provided those attributes "were not governed by jellyfish physiology or the glass-in-glass medium." *Id.* at 812.

In the present case, GAME's copyright cannot prevent others from depicting yellow ducks, with a bill, wings, a tail, and a crest on the head. All of those attributes are found on ducks in nature. Moreover, the general design and coloring of the duck has become a "stock or standard feature[]." *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1118 (9th Cir. 2018). As noted earlier, the GAME duck resembles the Rubber Duckie from Sesame Street and many other examples.[4] Therefore, there are very few protectable elements in the Derby Duck. The parties have focused on the addition of sunglasses as the crucial protectable element. And the Court agrees that the sunglasses are the key protectable element of the Derby Duck. But even there, GAME's copyright provides no protection to the *idea* of a duck float wearing sunglasses. Rather, GAME's copyright only protects the particular

---

[4] *See, e.g.*, https://www.cnn.com/travel/article/hong-kong-giant-duck/index.html (describing "great big yellow duck" that has "taken up temporary residence in cities all over the world"). The fact that a large floating yellow duck visited cities across the world is something that can be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. *See Ritter v. Hughes Aircraft Co.*, 58 F.3d 454, 458 (9th Cir. 1995) (concluding it was not an abuse of discretion to take judicial notice of newspaper articles).

expression of that idea. *See Bikram's Yoga Coll. of India, L.P. v. Evolation Yoga, LLC*, 803 F.3d 1032, 1037 (9th Cir. 2015) (noting copyright law provides no protection to an "idea" but only to a particular "expression"). That is, GAME is entitled to protection only for the way it expressed the idea of a duck wearing sunglasses.

Having identified the protectable element, there is "no hard-and-fast rule" that dictates whether Kangaroo's expression of the sunglasses-on-a-duck idea is substantially similar to the expression of that idea in the Derby Duck. *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1121 (9th Cir. 2018). Instead, the Court's task is to determine whether the two expressions of the sunglasses-on-a-duck idea are so similar that "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them." *Id.*

When confronted with the two ducks, and focusing on the sunglasses, there are a few striking differences. The sunglasses on the Derby Duck consist of a double bridge, are solid black, and most importantly are separately inflatable. The fact that the sunglasses are inflatable make the sunglasses a very prominent feature of the Derby Duck. By contrast, the sunglasses on the Kangaroo duck have a single bridge, are not solid black, and are merely painted on the duck's head. An "ordinary observer" confronted with the two works and focusing on the sunglasses would not be "disposed to overlook" these differences. *Rentmeester*, 883 F.3d at 1122. While the Derby Duck and Kangaroo's duck undoubtedly share the general idea or concept of a duck wearing sunglasses, GAME "cannot claim an exclusive right to ideas or concepts at that level of generality." *Id.*

The similarity of the protectable elements is not enough for GAME to pass the extrinsic test. Therefore, the Court need not continue and conduct the intrinsic test. But even if GAME had passed the extrinsic test, its copyright claim would fail. The intrinsic test requires the Court conduct "a more holistic, subjective comparison of the works to determine whether they are substantially similar in 'total concept and feel.'" *Rentmeester*, 883 F.3d at 1118. The two ducks do not meet this test.

The parties' ducks are very different when compared with any care. The Derby Duck has a red bill that is open. Kangaroo's duck has an orange bill that is closed. The

1  Derby Duck is a flat float while Kangaroo's duck is a ring float. Finally, the Derby Duck's
2  sunglasses are all black and exceptionally prominent. The Kangaroo duck's sunglasses are
3  only partially black and not especially prominent. In short, the "total concept and feel" of
4  the two ducks preclude a finding of liability on the copyright claim.

**II. Trademark Infringement**

For GAME to prevail on its trademark claim, it had to prove Kangaroo used marks that were "likely to cause consumer confusion." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011) (federal trademark law requires likelihood of consumer confusion). That requires assessing "whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998). This requires the confusion "be probable, not simply a possibility." *Murray v. Cable NBC*, 86 F.3d 858, 861 (9th Cir. 1996). Here, the relevant inquiry is whether a reasonable consumer seeing Kangaroo's marks[5] would mistakenly conclude GAME had some association with that product.

The Ninth Circuit requires courts deploy an eight-factor test to guide the likelihood of confusion analysis. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). The eight factors are: (1) strength of the mark; (2) proximity or relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) degree of care customers are likely to exercise in purchasing the goods; (7) defendants' intent in selecting the mark; and (8) likelihood of expansion into other markets. The Ninth Circuit has repeatedly stressed these eight factors should be viewed as providing a general framework for determining the relevant question. Thus, applying the eight factors "is not like counting beans." *One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1162 (9th Cir. 2009). And while some of the "factors are much more important than others . . . the relative importance of each individual factor [is] case-specific." *Brookfield Comm'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999). *See also Multi Time*

---
[5] GAME states the "marks" used by Kangaroo were pictures of Kangaroo's own duck and the duck itself.

- 11 -

*Machine, Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 936 (9th Cir. 2015) (noting the eight factors "are not exhaustive and other variables may come into play depending on the particular facts presented"); *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1141 (9th Cir. 2002) (noting court must not "mechanically" consider the eight factors).

### A. Strength of the Mark

The first factor is the strength of the mark. "The scope of the trademark protection that [courts] give marks depends upon the strength of the mark, with stronger marks receiving greater protection than weak ones." *Entrepreneur*, 279 F.3d at 1141. "This 'strength' of the trademark is evaluated in terms of its conceptual strength and commercial strength." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000). Assessing "conceptual strength" requires locating the trademark on the "spectrum of increasing inherent distinctiveness." *Id.* And assessing "commercial strength" requires determining "the strength of the mark in the marketplace." *One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1164 (9th Cir. 2009).

#### i. Conceptual Strength

"A mark's conceptual strength depends largely on the obviousness of its connection to the good or service to which it refers." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1107 (9th Cir. 2016). The Ninth Circuit determines conceptual strength by "classify[ing] [the] mark along a spectrum of five categories ranging from strongest to weakest: arbitrary, fanciful, suggestive, descriptive, and generic." *Id. See also E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992). Marks "with no commonly understood connection to the product" are considered "arbitrary" or "fanciful" and "trigger the highest degree of trademark protection." *Jim Beam*, 828 F.3d at 1107. Suggestive marks, which are entitled to a lower degree of protection, are those "which suggest a product's features and require consumers to exercise some imagination to associate the suggestive mark with the product." *Id.* Finally, "descriptive" marks are those that "define a particular characteristic of the product in a way that does not require any imagination" while "generic" marks are those that "describe the product in its entirety."

- 12 -

*Id.* Unfortunately, identifying the exact boundaries of these categories is difficult because "[c]ategorizing trademarks is necessarily an imperfect science." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1033 (9th Cir. 2010).

The Ninth Circuit's guidance for determining the "conceptual strength" of trademarks consisting solely of images is not clear. In one case, the trademark at issue was a pair of lips for a company that made vodka. The Ninth Circuit held there was "no commonly understood connection" between lips and "the alcohol product it represents." *Jim Beam*, 828 F.3d at 1108. Thus, in that case, a jury could reasonably conclude the lips were "arbitrary" and entitled to "the highest degree of trademark protection." *Id.* Here, GAME's trademarks fall into the "descriptive" or "generic" category. The trademarks are just stylized versions of the underlying products. A consumer does not need to exercise any imagination to associate the mark with GAME's products. Thus, GAME's marks have relatively little conceptual strength.

### ii. Commercial Strength

Moving beyond the marks' "conceptual strength," the other issue in determining strength is a mark's "commercial strength." That requires taking "into account a mark's actual marketplace recognition." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1034 (9th Cir. 2010). While evidence of actual consumer recognition likely would be best, marketplace recognition can also be established through evidence of "extensive advertising, length of exclusive use," and a large amount of sales. *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1536 (9th Cir. 1989) (noting "descriptive or suggestive mark may be strengthened" through advertising etc.).

Here, there was no evidence offered that consumers associate GAME's marks with GAME. But there was evidence that GAME has used its trademarks in advertising and had a substantial amount of sales. That advertising and sales mean GAME's marks have some "commercial strength" but the absence of any indication that consumers recognize the mark undercuts that strength to a significant degree.

On balance, the lack of conceptual strength and the absence of any meaningful evidence of consumer recognition (*i.e.*, limited commercial strength) means the "strength

of the mark" factor weighs in favor of Kangaroo.

### B. Relatedness of the Goods

The second factor is the "relatedness of the goods." When two entities provide similar goods, there may be a greater likelihood of confusion because consumers might "mistakenly assume there is an association between" the two entities. *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1150 (9th Cir. 2011). Alternatively, "the proximity of goods [might] become less important if advertisements are clearly labeled or consumers exercise a high degree of care, because rather than being misled, the consumer would merely be confronted with choices among similar products." *Id.* In other words, the fact that entities provide similar services can support or weaken the likelihood of confusion, depending on the context.

Here, the two ducks are direct competitors but GAME did not preserve the Amazon listing of Kangaroo's product. Accordingly, the Court could not determine whether Kangaroo prominently identified itself in that listing. The boxes, however, did clearly identify each company. Thus, while the products are related, there is insufficient evidence to determine whether the manner in which the products were presented or advertised would have caused consumers to assume there was an association between GAME and Kangaroo. This factor is neutral.

### C. Similarity of the Marks

The third factor is similarity of the marks. The Ninth Circuit has instructed that "[s]imilarity is best adjudged by appearance, sound, and meaning." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1032 (9th Cir. 2010). Crucially, however, a court must also take into account how the marks "appear in the marketplace." *Id.* As explained at post-trial arguments, GAME believes the relevant comparison is between the pictures on Kangaroo's box to GAME's marks. The pictures and marks, however, have some distinct differences. For example, the sunglasses on the marks and the sunglasses on Kangaroo's float were different in shape. In addition, the overall shape of the mark compared to the shape of Kangaroo's ring float were also different. It is true, however, that both Kangaroo's box and GAME's marks are ducks

wearing sunglasses. Thus, the marks have some similarity, although the Court is not convinced because specific evidence was not offered that, when encountered in the marketplace, consumers would associate the pictures on Kangaroo's box with the trademarks used by GAME. This factor weighs slightly in favor of GAME.

### D. Evidence of Actual Confusion

The fourth factor involves evidence of actual consumer confusion. GAME presented no evidence of actual confusion. Thus, this factor weighs in favor of Kangaroo.

### E. Marketing Channels Used

The fifth factor requires looking to the marketing channels used by GAME and Kangaroo. In general, two entities using the same marketing channels increases the likelihood of confusion. *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011). This factor is most helpful when the two entities belong to a niche market and advertise in specialized outlets, such as trade magazines. *Id.* But this factor "does not shed much light on the likelihood of consumer confusion" when the two entities use standard channels, such as television, radio, and the Internet. *Id.* Both GAME and Kangaroo used Amazon to market their products. Given the breadth of products available on Amazon, it cannot be deemed a specialized outlet. And there is no other evidence of Kangaroo's marketing. This factor, therefore, does not weigh strongly in either party's favor.

### F. Degree of Care

The sixth factor requires assessing the nature of the goods or services and the type of consumer who would be interested in those goods or services. Generally, consumers are expected to proceed with more care if the goods or services are specialized or of uncommon importance. For example, "highly specialized professional purchasers" responsible for the purchase of drawer mechanisms were "expected to exercise a high degree of care." *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1537 (9th Cir. 1989). Consumers making impulsive purchasing decisions, however, are not expected to exercise much care. *Nova Wines, Inc. v. Adler Fels Winery LLC*, 467 F. Supp. 2d 965, 981 (N.D. Cal. 2006).

The parties' experts disagreed on the amount of care consumers would exercise when purchasing an inflatable duck. But given the low cost and simplicity of the ducks, the Court concludes consumers exercised a relatively low amount of care. This factor, therefore, supports GAME.

### G. Kangaroo's Intent

The seventh factor requires determining why Kangaroo started using the allegedly infringing mark. "When one party knowingly adopts a mark similar to another's, reviewing courts presume that the defendant will accomplish its purpose, and that the public will be deceived." *Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991). From the testimony and video of Mr. Ligeri, there is no question that Kangaroo set out to compete with GAME. But there's also no question that Kangaroo made some visible changes to its duck in an apparent attempt to avoid copyright infringement. In the end, however, Kangaroo knowingly used marks similar to GAME's in an attempt to capitalize on what was already popular. This factor supports GAME.

### H. Likelihood of Expansion

The final factor involves the likelihood that Kangaroo will expand its business to compete with GAME. Because the products are already direct competitors, this factor is irrelevant.

### I. Summary

Looking to the factors together, some support GAME, some support Kangaroo, and some are neutral. GAME can rely on:

- similarity of the marks (but limited by the fact that Kangaroo's product is different and was portrayed differently);
- degree of care customers exercise; and
- Kangaroo's clear intent in selecting the mark (but diminished by the fact that Kangaroo placed the Kangaroo name on the packaging which was visible).

Kangaroo can rely on:

- the strength of the mark (has little conceptual strength and relatively little evidence of commercial strength);

- no evidence of actual confusion.

And three factors are neutral: relatedness of the goods, marketing channels, and likelihood of expansion into other markets.

Even though more factors support GAME than Kangaroo, evaluating the factors as a whole, and in light of all the other evidence, GAME has not established a probability of confusion. To be sure, there is some "possibility" of confusion. But that is not enough. *Murray v. Cable NBC*, 86 F.3d 858, 861 (9th Cir. 1996). The products and their boxes are sufficiently different such that consumers would not be confused into concluding Kangaroo's product were manufactured by GAME. The trademark infringement claim fails.

**III. Unfair Competition**

At trial and in post-trial briefing, GAME did not focus on its separate claims for federal and state unfair competition. For purposes of the federal claim, GAME argued the test for a federal "unfair competition claim is exactly the same as for a trademark infringement claim—whether there is a likelihood of confusion between the two marks." (Doc. 182 at 12). Because the trademark infringement claim fails, so does the federal unfair competition claim.

As for its state unfair competition claim, GAME's argument during and after trial was that "a plaintiff must prove that a defendant engaged in conduct amounting to 'passing off' or 'palming off' by expressly or impliedly representing its product as a product from plaintiff." (Doc. 182 at 13). But GAME then argued "the touchstone under Arizona is 'whether the public is likely to be confused' by the defendant's conduct" and referenced its arguments regarding trademark infringement. (Doc. 182 at 13). Thus, during the trial and post-trial briefing, GAME appeared to believe its state unfair competition claim would also fail if its trademark infringement claim failed.

During post-trial argument, however, GAME changed its approach by stressing Arizona's unfair competition law is "exceptionally broad" and is meant to target a "wide variety of anti-competitive behavior." GAME then pointed to clear "evidence of copying

[and Kangaroo's] practice of copying other products" as establishing "the way [Kangaroo] did business." GAME appears to believe there is a general unfairness in the way Kangaroo designed and manufactured its duck such that Kangaroo committed unfair competition.

Under Arizona law, "the ultimate question" for unfair competition "is always whether trade is being unfairly diverted, and whether the public is being cheated into the purchase of something which it is not in fact getting; *the courts interfere solely to prevent deception.*" *Skydive Arizona, Inc. v. Hogue*, 360 P.3d 153, 162 (Ariz. Ct. App. 2015). The fact that Kangaroo determined what products were popular and then made different versions of those products does not, on its own, establish trade was "unfairly diverted" from GAME to Kangaroo. Though there was evidence of Kangaroo's clear intent to capitalize on the popularity of the Derby Duck, the Court would need evidence of how the public was being cheated or deceived to conclude Kangaroo's competitive behavior was improper. After all, Arizona's unfair competition doctrine is not meant to prevent all competition. As noted in the Restatement (Third) of Unfair Competition, "[t]he freedom to engage in business and to compete for the patronage of prospective customers is a fundamental premise of the free enterprise system." § 1 (1995) (comments). And a seller is free "to seek to divert business not only from competitors generally, but also from a particular competitor." *Id.* GAME has not offered any authority that merely producing a product similar to an existing product is sufficient to support a finding of unfair competition.

Unfortunately for GAME, the Court does not have the Amazon listing of Kangaroo's duck float. That would be the most critical evidence for assessing Kangaroo's conduct. If Kangaroo had designed that listing to capitalize on GAME's own success, GAME might well be entitled to relief. For example, if the Amazon listing made representations that the two floats were manufactured by the same company or if the Amazon listing contained pictures of the Derby Duck but Kangaroo then delivered its own duck, GAME's unfair competition claim would be on much stronger ground. But with no evidence of how the public encountered Kangaroo's duck or what Kangaroo did in its

marketing efforts, the Court does not have a sufficient evidentiary basis to conclude Kangaroo did anything wrong.

### IV. Summary

GAME has not established by a preponderance of the evidence that Defendants committed copyright infringement, trademark infringement, or unfair competition under federal or Arizona law. Kangaroo asserted counterclaims for declaratory judgment but, as admitted in the Joint Proposed Pretrial Order, those counterclaims are mirror images of GAME's affirmative claims for relief. (Doc. 146 at 10). Therefore, the Court will dismiss the counterclaims. *See Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 533 (9th Cir. 2008) ("Federal courts do not have a duty to grant declaratory judgment; therefore, it is within a district court's discretion to dismiss an action for declaratory judgment.").

Accordingly,

**IT IS ORDERED** Defendants' counterclaims are **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** the Clerk of Court is directed to enter judgment in favor of Defendants and close this case.

Dated this 17th day of July, 2019.

Honorable Roslyn O. Silver
Senior United States District Judge